[Civ. No. 3924. Third Appellate District.—December 3, 1929.]

R. H. REED, Respondent, v. W. T. WELLS, Appellant.

Walter Osborn and Frederick E. Hoar for Appellant.

E. A. Klein and L. E. Nathan for Respondent.

FINCH, P. J.—The plaintiff was given judgment for damages alleged to have been caused by the defendant's breach of the terms of a lease. The defendant has appealed.

By the terms of the lease the defendant let to the plaintiff 120 acres of land for one year, commencing December 1, 1925, at a cash rental of $20 an acre, all the lands ''to be cropped entirely to cotton, except 20 acres, which may be cropped in whole or in part to such other crops as said Reed may elect.'' Wells agreed, among other things, ''to dig a well near said house and another one on the S. E. corner of the S. E. quarter of the N. W. quarter, and if either of said wells fail to produce as much as 250 gallons per minute when pumped, he will sink other wells so as to have a production of at least 250 gallons per minute at each of the two points; he will also place in each of said wells a pump and engine capable of producing and delivering at least 250 gallons of water per minute into the reservoirs, one of which shall be located at each well and shall be not less than 100 feet square and hold at least 4 feet of water. It is understood that these pumps and engines are not to be new, but they are to be in good condition and ready for use, and the said Reed is to look after their further repair and their fuel supply—Wells to have no further obligation than the setting of the pumps and having them ready for use, and in good and proper condition for use. . . . Said Wells will also level said land so that a six inch head of water will go over it—the levels to be taken between borders, and any land that he cannot or does not level shall be credited back to said Reed at the regular rental price per acre. The said Wells will also open and make passable the road running through the center of the section. . . . Also, he will extend the ditches running from the east line of the section, so as to serve all the rented premises.''

The complaint alleges:

"That plaintiff put 80 of said acreage into cotton. . . . That defendant refused and failed to level the land as agreed upon, so that plaintiff could not put the balance of said acreage into cotton as agreed upon; also refused to put in sufficient wells so that plaintiff was unable to get any or sufficient water for said cotton; also refused and failed to put in pump and engine as agreed upon for the pumping of said water; and also refused to open and make passable the road through the center of said section as set forth in the next to the last paragraph of said agreement; also failed and refused to extend the ditches running from the east line of the section as agreed upon in the last paragraph of said agreement.

"That by reason of the failure on the part of defendant to perform his part of said agreement as above set forth plaintiff was prevented from proceeding with his part of said agreement, and that said crop was a total loss to plaintiff.''

The defendant answered the complaint, denying that he failed or refused to perform any of said terms of the lease on his part, and filed a cross-complaint for the rent provided for in the lease.

Under the express terms of the lease, the plaintiff was not entitled to damages by reason of the defendant's failure to level forty acres of the land, but only to be relieved from payment of "the regular rental price per acre" for such land. The complaint does not allege that the land on which the plaintiff planted cotton was not properly leveled. In respondent's brief it is said:

"No claim was made by respondent for damages by reason of the nonleveling of the land. . . . The only issue at the trial was whether or not there was sufficient water furnished by defendant for the cotton on the 80 acres. . . . Defendant had agreed by his contract to put in sufficient wells, etc., to supply water enough for the crop. That was the only question. . . . The action was commenced by respondent for the recovery of the damages due him by reason of the failure on the part of appellant to furnish sufficient water which caused a total crop failure.''

During the early part of the season the plaintiff used water from the canal of the Miller & Lux Land Company

for irrigation. It appears that such use was contemplated by the parties. The lease provides for the extension of "the ditches running from the east line of the section, so as to serve all of the rented premises." The leased land was all in the northwest quarter of the section and the wells referred to in the lease were to be located in the same quarter section. The extension of the ditches referred to connected the leased land with the canal of the Miller & Lux Land Company.

The plaintiff, regardless of the natural slope of the land, divided it into straight strip checks forty rods long and fifty feet wide, without any cross or contour levees. The plaintiff testified that the defendant told him to check the land in that manner. In that connection, he further testified as follows: "Q. Don't you know it is the custom . . . to throw up the levees so that the high land will irrigate . . . in separate checks and the low land in other separate checks? . . . A. Well, yes, that is the custom. A fellow don't have a civil engineer or leveling—how is he going to know the high and low land. I was just doing according to his orders. . . . Q. Now, you say you put this water on the land before you planted it, did you not? A. I did. Q. Couldn't you tell with the water on the land then where the high and low land was? A. I know— Q. Then after that couldn't you have thrown up your levees in such a manner as to hold the water on the high land? . . . A. Why, sure, I could. . . . Q. And you didn't throw up any further levees after the first irrigation? A. I did not. . . . Q. You made the borders, and in making these borders did you pay any attention to the contour of the land? A. With my natural eye, I couldn't tell. . . . Q. You could not have contoured that land at all? A. It could have been done, yes."

The plaintiff testified that he irrigated the land before planting, commencing April 15th; that he commenced planting about April 25th; that he did not irrigate any of the land after planting except about twenty-six acres "where the cotton first died"; that he "watered it (the 26 acres) the second time to put in maize," but that he did not plant any maize; that he quit irrigating "when the water quit coming down the ditch," probably about the first of June; that the land "wasn't level, but at the same time by a big

head of water you could push water over it''; that the
cotton came up and ''got all the way from an inch high
up to probably hip, shoulder high; it just depended on
where the land got sufficient water to irrigate the whole
thing through''; that on July 19th the crop had died ''just
in spots where the land was steep, something like where it
would run over fast that cotton died fast; it didn't live ten
days after I got it up; . . . down in other places, where it
would go six or eight, ten inches deep and get a good soak-
ing that cotton lived probably some of it until the middle
of June and July kept dying''; that where the plants died
first ''the water run over the land so fast it didn't wet the
land but just a little on top and by the time the cotton
got up the moisture had left it''; that after irrigating the
land and before planting it he ''had it disked and har-
rowed''; that part of it was then ''well moist'' and ''part
of it wasn't; at the same time I went ahead and planted
it''; and that the whole crops raised amounted to only four
or five bales of cotton; that he left the place about July
18th or 19th, without any notice to the defendant, and did
not thereafter return.

The evidence shows without conflict that the defendant
dug wells at the places specified in the lease, each producing
about 400 gallons a minute. It is true the plaintiff testified
that the well near the house was tested about the first of
March and that it produced only ''a little stream about as
big as my wrist,'' but another well was thereafter sunk
''right by the side'' of the one mentioned and the defendant
''coupled the two together'' and installed a pump and en-
gine. The evidence shows that they produced 400 gallons
a minute. The plaintiff testified that the pump and engine
were not installed, but the only things which he men-
tioned as lacking were a magneto and a belt. Other wit-
nesses testified that the magneto and belt were in place.
Two wells were dug at the ''southeast corner of the south-
east quarter of the northwest quarter'' of the section, at
a point referred to as point ''N.'' A witness for the de-
fendant testified that at point ''N'' there was ''just the
one that the pump was put in and the engine connected;
the other one was never connected with the engine.'' This
was done about the middle of May. At a later stage in

his testimony the witness was asked: "Do you happen to know of your own knowledge when this well at point 'N' was connected up?" He replied: "Well, that never was connected up. After Mr. Reed left I moved the engine and pump on another well." There is nothing to indicate which of the two wells at point "N" was referred to in the question and answer, but in view of the testimony of the witness first quoted, it is to be inferred that the last answer referred to the well, mentioned in the first answer, which "was never connected with the engine." Another witness testified that it was not necessary to "couple both of the wells" at point "N," "because the one well furnished enough water for the pump he had on, . . . a four inch pump." The water-master, who had charge of the distribution of water for the Miller & Lux Land Company, testified that until "the 30th day of June there was all the water that anyone wanted." This statement finds some corroboration in plaintiff's letter to defendant, dated June 29, 1926, stating: "I would like very much if you would send some one out to fix up the pumps and res. I never got through irrigating before ditch water gave out."

Viewing the evidence in the light most favorable to the plaintiff, it shows merely that the defendant failed to equip the pumping plant at the house with a magneto and belt.

Appellant contends that the plaintiff is not entitled to the net value of the crop which he lost because he did nothing to minimize his loss, which he might have prevented by a small expenditure for a magneto and a belt. There are cases which support this contention. (*Sargent* v. *North End Water Co.*, 190 Cal. 512 [213 Pac. 33]; *Severini* v. *Sutter-Butte Canal Co.*, 59 Cal. App. 154 [210 Pac. 49].) The answer, however, set up no such defense, and it does not appear that any such contention was made in the trial court or any instruction in relation thereto requested. It has been held to be the duty of the defendant to plead and prove the facts upon which such a defense is based. (*Vitagraph, Inc.*, v. *Liberty Theatres Co.*, 197 Cal. 694, 699 [242 Pac. 709].)

There appears to be no escape from the conclusion that the failure of the plaintiff's crop was largely due to his own fault. According to his testimony, he failed to

check the land in the proper and customary manner, with the result that it was unevenly irrigated, causing a considerable part of the crop to die shortly after it came up. It is no answer to say that the defendant told the plaintiff to prepare the land as the latter prepared it. The plaintiff was under no obligation to follow such direction. He had had long experience in raising cotton and in the irrigation thereof. Neither is it any excuse that it would have been necessary for the plaintiff to incur the expense of employing an engineer or surveyor in order to properly check the land for irrigation. That is a usual expense in the preparation of land for irrigation and one which the defendant was not bound to incur. ■ The court instructed the jury as follows:

"You are instructed that, if you find by a preponderance of the evidence that the plaintiff, Reed, pursuant to the lease and agreement between plaintiff and defendant, went upon defendant's land, and prepared said land for planting, and planted therein a crop of cotton and that defendant failed to comply with his contract in any particular and material part thereof, and that such breach if you find there was a breach was the proximate and direct cause of the failure of the crop then your verdict must be for the plaintiff on his complaint, and you are further instructed that the measure of damages to which plaintiff would be entitled under these circumstances is the value of the crop in the condition it was at the time and place of destruction and in arriving at the value of the crop of cotton, as it stood at the time of its destruction, you will estimate the probable yield of the land planted to cotton, multiplied by the market value of the crops, and deduct therefrom the cost of producing and marketing said crop, and the value of the crop actually harvested. The amount remaining will be the amount of damages to which plaintiff would be entitled, if you find he is entitled to damages if the amount is less than the rent, then the damages should be deducted from the rent."

This instruction is erroneous in at least two particulars. It authorizes a verdict for the plaintiff, even though he may have failed to check the land in a proper and the customary manner, or to plant, cultivate and irrigate the crops

properly. It is true that, in a subsequent instruction, the jurors were told that if the "plaintiff has not complied with each and all of the terms and conditions of the lease on his part to be kept and performed, . . . he cannot recover." But the two instructions are conflicting. ■ "The authorities are legion to the effect that a so-called 'formula' instruction must contain all the elements essential to a recovery, and the absence of any one of such elements may not be compensated for nor cured by a reference thereto in other instructions correctly and fully stating the law." (*Douglas* v. *Southern Pac. Co.*, 203 Cal. 390, 393 [264 Pac. 237, 238].) While the evidence in a particular case, together with other instructions given therein, may warrant the conclusion that an erroneous formula instruction has not resulted in a miscarriage of justice, there is nothing in this case to justify such a conclusion. The plaintiff called no witness except himself and his testimony was general and indefinite in character. It appears from such testimony that he did not properly check the land for irrigation and that he applied the water available for a second irrigation to land on which his crop had perished instead of on land having a growing crop. The only term of the lease to which the second instruction quoted is applicable provides that the plaintiff "is to properly seed and cultivate the said lands to the crops" to be grown thereon. It is doubtful whether jurors would understand that the plaintiff was thereby required to check and irrigate the land in a proper manner.

■ The instruction is also erroneous in stating that the plaintiff is entitled to damages resulting from defendant's failure "to comply with his contract in any particular and material part thereof." Under this instruction the jury may have based the verdict on breaches of the lease by defendant which were not in issue. It was his duty under the lease to "level said land so that a six inch head of water will go over it." The plaintiff testified that parts of the eighty acres planted to cotton were not so leveled, but there was no such issue before the court, the only issue, as stated by respondent, "was whether or not there was sufficient water furnished by defendant."

■ The plaintiff testified in substance that the failure of the crop and his abandonment thereof were due to an

insufficient supply of water for irrigation. The defendant was not permitted to prove that such failure and abandonment were due to the plaintiff's financial inability to perform his obligations under the lease. The evidence sought to be introduced was admissible as tending to discredit the plaintiff's testimony last mentioned.

The judgment is reversed.

Jamison, J., *pro tem.*, and Thompson (R. L.), J., concurred.